60 P.3d 882

**David K. DAVENPORT,**
Respondent/Claimant–
Appellant,

v.

**CITY AND COUNTY OF HONOLULU,
HONOLULU FIRE DEPARTMENT,**
Petitioner/Employer–Appellee.

No. 23141.

Supreme Court of Hawai'i.

Dec. 30, 2002.

Paul K.W. Au, Deputy Corporation Counsel, on the briefs, for petitioner/employer-appellee, self-insured.

David K. Davenport, on the briefs, respondent/claimant-appellant pro se.

LEVINSON, NAKAYAMA, and RAMIL, JJ.; MOON, C.J., Dissenting; and ACOBA, J., Concurring Separately.

Opinion of the Court by RAMIL, J.

## I. INTRODUCTION

Petitioner/employer-appellee City and County of Honolulu, Honolulu Fire Department ("the Department") petitioned this court for a writ of certiorari to review the published opinion of the Intermediate Court of Appeals ("ICA") in *Davenport v. City and County of Honolulu, Honolulu Fire Department*, 100 Hawai'i 297, 59 P.3d 932 (Hawai'i App.2001) [hereinafter *"Davenport I"*]. The ICA affirmed in part, vacated in part, and remanded the January 5, 2000 Amended Decision and Order of the Labor and Industrial Relations Appeals Board ("the Board").

The Department contends that the ICA erred in holding: (1) psychological injuries resulting from the stress of non-disciplinary personnel actions are compensable under Hawai'i's worker's compensation statute, Hawai'i Revised Statutes ("HRS") chapter 386 (1963); and (2) remand is required for findings on whether claimant David Davenport's ("Davenport") hypertension is compensable as an injury directly and naturally resulting from a compensable primary injury.

We granted certiorari because we believe the ICA erred in its application of *Mitchell v. State Department of Education*, 85 Hawai'i 250, 942 P.2d 514 (1997). Although we agree the ICA's conclusion that Davenport's injuries are compensable, we believe that the ICA erred in applying *Mitchell* to the present case and failing to apply the unitary test to determine whether the personnel action that gave rise to the injury arose out of employment. We otherwise affirm the ICA's holding that the Board was clearly erroneous in finding that Davenport's hypertension injury resulted from the stress of a medical examination conducted on April 10, 1995. We

further affirm the ICA's holding to vacate the Board's determination of Davenport's hypertension claim and remand to resolve the issue of whether the hypertension injury was a direct and natural result of a prior compensable injury.

## II. BACKGROUND

Davenport became a firefighter with the Department on January 3, 1972 with his ultimate goal being a captain's position. The subject of this appeal concerns two psychological injuries. The first injury occurred in January 1994 and originated from stress surrounding Davenport's endeavor to advance to the position of Fire Fighter Level III ("FFI-II"), one level below captain. Davenport's second injury concerns his elevated blood pressure condition diagnosed in April 1995, allegedly stemming from a prior compensable injury to his Achilles tendon.

### A. *January 1994 Injury*

On November 2, 1991, Davenport took promotional examinations for placement on the lists of eligibles for Fire Fighter Level II ("FFII") and FFIII positions. Davenport was dissatisfied with the outcome of the test, specifically, his resulting ranking. According to Davenport, he was originally ranked seventeen on the FFII list, but after a determination that he was not credited properly for education, his ranking increased to eight. His position on the list for FFIII eligibles, however, was not improved. Davenport filed a petition of appeal with the City and County of Honolulu's Civil Service Commission ("the Commission"), requesting that the Commission: (1) disclose certain information relating to three challenged test questions; (2) clarify the formula used by the Personnel Department to compute the scores; and (3) allow additional time for administrative review of the test results.

In July and November of 1993, the Commission held two hearings to resolve Davenport's claims, at which the parties discussed the selection process for determining how candidates are chosen to be placed on the list of eligibles. The Commission delayed ruling on Davenport's complaint and directed the Personnel Department to review the promotion process to ensure that it was fair and equitable. As a result, the Commission's

proceedings and hearings on Davenport's petition continued for the next several years and throughout the duration of this appeal. Davenport claims, however, that these events did not contribute to the cause of his psychological injuries.

Meanwhile, in October 1993, the Department promoted Davenport to FFIII. His tenure was cut short, however, when the Department rescinded his promotion in November 1993 and sent him back to his former FFII assignment. The Department claimed that it was forced to take this action after several firefighters filed a lawsuit contesting the validity of the Department's promotional examination. In an attempt to comply with a temporary restraining order issued by the circuit court, against the use of the examination in promoting individuals to the positions of FFIII and captain, the Department rescinded seven promotions, including Davenport's. Davenport claims he was "devastated" by the Department's action. Fire Chief Donald S.M. Chang orally promised Davenport and the other firefighters that the Department would reinstate their promotions before January 1994. However, Richard R. Seto Mook replaced Chang in November 1993, and Davenport's promotion was not reinstated as promised. Davenport was again very upset and went on sick leave. On January 21, 1994, a doctor treated him for symptoms associated with hiatal hernia and irritable colon, which kept him off work for approximately two weeks. In February 1994, the Department reinstated Davenport's promotion to FFIII, but refused to credit Davenport's probationary period for the time he had accumulated from the previous promotion.

Davenport alleges that during this time, he was forced to endure a hostile work environment and harassment by his superiors. The exact nature of these allegations are not clear. However, Davenport claims that, on one occasion, shortly after the reinstatement of his promotion, Fire Chief Seto Mook called him and stated that "if he did not stop his complaining, he would be squashed like a pest, like a fly." Chief Seto Mook's alleged statements were apparently referring to Davenport's appeal to the Commission and

his complaints regarding the promotion process.

On October 25, 1994, Davenport filed a claim for worker's compensation benefits for this injury, which he described as "stress, hiatal hernia, [and] irritable colon," caused by "a long series of administrative difficulties regarding [his] promotion over the last several years[.]" *Davenport I*, 100 Hawai'i at 301, 59 P.3d at 936. The Department denied the claim pending investigation.

## B. *April 1995 Injury*

The second injury at issue in this case is Davenport's condition of elevated blood pressure described by Davenport as "stress—cumulative trauma and pain from industrial injuries." *Id.* The hypertension allegedly originated from a prior injury that occurred on May 2, 1994, when Davenport tore his right Achilles tendon while playing paddle tennis at the fire station. He underwent surgery and went on total temporary disability ("TTD") from May 5, 1994 to June 14, 1995. The Department accepted liability for the Achilles tendon injury.

While on leave, Davenport began seeing a psychiatrist, Dr. Gordon J. Trockman, for treatment of psychological problems, including depression over his immobility from the foot injury, anger and depression over issues at work, family problems, medical problems (irritable colon and hiatal hernia), and difficulties dealing administratively with the medical system. A clinical psychologist, Joseph P. Rogers, evaluated Davenport in February 1995 and explained that "[a] contributing factor to the build up of perceived stress over the years has been his dogged persistence in pursuing these [promotion and grievance] issues without compromise." *Id.* at 301, 59 P.3d at 936. Dr. Trockman filed a physician's report for this injury describing it as "[t]orn Achilles tendon physically[.] Depressed, frustrated, and upset emotionally due to additional stress, etc. [sic]."[1] *Id.* (brackets in original).

On April 10, 1995, while still on leave and receiving TTD benefits for the Achilles tendon injury, Davenport saw Dr. John Hall, the Department's physician, for the purpose of evaluating his ability to return to work. During this examination, Davenport was diagnosed with elevated blood pressure and was alerted to the fact that he would face medical disqualification if he did not submit a medical report and treatment plan for the hypertension by May 27, 1995. Davenport filed a worker's compensation claim for the treatment of the hypertension and referenced April 10, 1995 as the date of injury, which he described as "stress—cumulative trauma and pain from industrial injuries." The Department denied liability for this claim.

## C. *Board's Decision*

The Department of Labor and Industrial Relations, Disability Compensation Division ("DCD") held a hearing to examine Davenport's claims on October 15, 1996. At the hearing, Davenport alleged that his injuries resulted from: (1) harassment and threats from his superiors and other coworkers; (2) the alleged illegal activities committed by the Department during the promotion process; and (3) the depression he suffered from his Achilles tendon injury. The DCD held that

> [Davenport] did not suffer compensable injuries. It is the opinions of Drs. Stitham, Ponce, Rogers and Trockman that [Davenport's] psychiatric problems were caused *not by his duties as a fireman, but from the stress of dealing with the administrative process* associated with his promotion as a fireman. Even though there is a causal relationship between his injuries and the work environment, [the Board] has held *psychiatric injuries arising out of personnel actions at work are noncompensable.* See *Mitchell* and subsequent related cases.... Therefore, [the Department] is not responsible for benefits relating to the January 14, 1994 and April 10, 1995 injuries. The claims are hereby denied.

---

1. Davenport was compensated for this injury and thus, the Achilles tendon and related stress injuries are not issues on appeal, but are relevant to the determination of the April 1995 hypertension claim.

Department of Labor and Industrial Relations, Findings of Fact, November 21, 1996 (emphasis added).

Davenport appealed to the Board and appeared *pro se* at a hearing on November 2, 1998. The Board agreed that Davenport's January 1994 and April 1995 psychological injuries did not arise out of and in the course of employment, but found that Davenport had sustained a psychological injury as a compensable consequence of his Achilles tendon injury.[2]

On October 27, 1999 Davenport filed a motion for reconsideration and requested that the Board reconsider its conclusion that the injuries did not arise out of and in the course of employment with the Department. Davenport argued that the Board misconstrued his claim as to the cause of the January 1994 injury. It was Davenport's position that the injury arose out of the Department's failure to reinstate his promotion when promised, not from the Civil Service appeals process.

On January 5, 2000, the Board rendered an amended decision and order, finding that

> [Davenport's] January 14, 1994 psychological condition *resulted from his involvement in the Civil Service administrative appeals process and not from the new fire chief's failure to honor the alleged promise of the chief's predecessor.* ... [P]articipation in the Civil Service administrative appeals process to challenge the examination and promotion procedure is too remote from the usual and reasonable work of a firefighter to be considered and incident of [Davenport's] employment.

Labor and Industrial Relations Appeals Board, Amended Decision and Order, Jan. 5, 2000 (hereinafter *"Board's Amended Decision"*) (emphasis added).

Regarding Davenport's April 1995 hypertension claim, the Board found that "[Davenport] alleged that [the Department] conducted an improper physical examination on him while he was on industrial leave and that he was threatened with medical disqualification from his job because of his work injury."

*Board's Amended Decision* at 11. Thus, the Board held "that [Davenport] did not sustain a psychological injury on or about April 10, 1995, arising out of and in the course of employment ... [because he] was receiving TTD benefits for his May 2, 1994 work injury, and was not at work in April of 1995." *Id.* at 13.

## D. *ICA Opinion*

Davenport appealed the Board's Amended Decision arguing that the Board was clearly erroneous in making the following findings of facts and conclusions of law: (1) Davenport's January 1994 injury arose out of the administrative appeals process and is thus too remote from the usual and reasonable work of a firefighter to be considered an incident of employment; (2) the alleged harassment did not contribute to the January 1994 injury; and (3) the April 1995 hypertension injury is not compensable because it occurred while Davenport was on leave.

In its published opinion, the ICA affirmed in part, vacated in part, and remanded the Board's Amended Decision. The ICA stated that "regardless of how Davenport's January 1994 claim is articulated, the Board's ultimate determination that it was not compensable was wrong as a matter of law." *Davenport I,* 100 Hawai'i at 305, 59 P.3d at 940. Thus, the ICA held: (1) Davenport's January 1994 injury was compensable because HRS § 386–3 covers psychological injuries arising out of non-disciplinary promotions and demotions; and (2) remand was required for findings on whether Davenport's hypertension was compensable as being the direct and natural result of his prior compensable Achilles tendon and stress injuries.

The ICA relied on HRS § 386–3(a), which states:

> If an employee suffers personal injury either by accident *arising out of and in the course of the employment* or by disease proximately caused by or resulting from

2. Davenport suffered from depression and anxiety as a *direct result of his physical Achilles tendon injury.* Because these psychological injuries were the direct and natural result of his

prior compensable Achilles tendon injury, the Board held the injuries were compensable. Thus, these psychological injuries are not at issue in this appeal.

the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.

HRS § 386–3(a) (emphasis added). Because "Hawai'i courts have unequivocally established that purely psychological injuries are within the contemplation of HRS § 386–3[,]" *Davenport I*, 100 Hawai'i at 306, 59 P.3d at 941 (citing *Royal State National Insurance v. Labor Board*, 53 Haw. 32, 38, 487 P.2d 278, 282 (1971)), the ICA framed the issue on appeal as "whether psychological injuries engendered by non-disciplinary personnel actions . . . arise out of and in the course of the employment and hence fall within the ambit of compensability outlined by HRS § 386–3." *Id.* at 306, 59 P.3d at 941.

In answering this question, the ICA relied heavily on our decision in *Mitchell v. State Department of Education*, 85 Hawai'i 250, 942 P.2d 514 (1997), where we held that a teacher's psychological injuries that resulted from being disciplined for her use of corporal punishment in the classroom were compensable. The ICA noted that in *Mitchell*, this court was guided by the "plain language of [HRS § 386–3] . . . and the legislature's intent that work-related injuries be considered as a cost of doing business." *Davenport I*, 100 Hawai'i at 307, 59 P.3d at 942. The ICA highlighted the point made in *Mitchell* that, because HRS § 386–3 did not expressly exclude injuries arising out of disciplinary actions from coverage, the court could not "unilaterally pronounce" an exception. Thus, the ICA held that, "[u]nder the logic of *Mitchell*, . . . the psychological injury arising out of the non-disciplinary promotion and demotion at issue here would appear to be compensable under HRS § 386–3." *Id.* at 307, 59 P.3d at 942.

The ICA then turned its analysis to the legislative history that surrounded the amendment to HRS § 386–3, enacted in response to *Mitchell*. Shortly after *Mitchell* was decided, the legislature added subsection c to HRS § 386–3, which provides that "[a] claim for mental stress resulting solely from

disciplinary action taken in good faith by the employer shall not be allowed[.]" HRS § 386–3(c) (1998). The ICA noted that the legislative history surrounding the amendment showed that the legislature considered and rejected extending the amendment to exclude coverage of personnel actions. Thus, the ICA stated, "[i]t is apparent from the legislative history [that] . . . the legislature assumes that psychological injuries engendered by other kinds of non-disciplinary personnel actions, such as promotions and demotions, arise out of and in the course of employment." *Davenport I*, 100 Hawai'i at 308, 59 P.3d at 943.

On appeal to this court, the Department alleges that the ICA committed the following grave errors of law: (1) the ICA failed to apply the clearly erroneous standard of review to the Board's findings; (2) the ICA failed to apply the unitary work connection test for determining compensability; (3) the ICA's reliance on legislative history regarding HRS § 386–3(c) is misplaced; and (4) the ICA erred by remanding the April 1995 claim for a redetermination of compensability because the issue of whether the April 1995 claim was a direct and natural result of his previous Achilles tendon claim was never at issue before the Board.

## III. STANDARD OF REVIEW

### A. *Board Decisions*

 Appellate review of Board decisions is governed by HRS § 91–14(g) (1993). *Korsak v. Hawai'i Permanente Medical Group*, 94 Hawai'i 297, 302, 12 P.3d 1238, 1243 (2000). The Board's findings of fact are reviewed under the clearly erroneous standard in view of the "reliable, probative, and substantial evidence on the whole record." *Id.* at 302–03, 12 P.3d at 1243–44 (brackets and citation omitted). "The clearly erroneous standard requires the court to sustain the [Board's] findings unless the court is left with a firm and definite conviction that a mistake has been made." *Id.* (citation omitted). However, the Board's conclusions of law cannot bind an appellate court and are "freely reviewable for [their] correctness. Thus, the court reviews [conclusions of law]

de novo, under the right/wrong standard."
*Id.* (citation omitted).

### B. *Statutory Interpretation*

The interpretation of a statute is a *de novo* inquiry for the appellate court.

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.... This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning.

*Id.* at 303, 12 P.3d at 1244 (internal quotations and citations omitted).

## IV. DISCUSSION

### A. *January 14, 1994 Injury*

The Department alleges that the ICA erred in holding that psychological injuries deriving from non-disciplinary personnel actions arise out of and in the course of employment and are thus compensable under HRS § 386–3. We agree with the ICA's conclusion that Davenport's January 1994 injury is compensable. We find it necessary, however, to clarify the analysis of such claims and the application of our prior decisions in *Mitchell,* 85 Hawai'i 250, 942 P.2d 514, and *Tate v. GTE Hawaiian Telephone Co.,* 77 Hawai'i 100, 881 P.2d 1246 (1994) to the present case.

### 1. *The Board's Findings of Fact*

The Board determined that Davenport's January 1994 injury "resulted from his involvement in the Civil Service administrative appeals process and not from the new fire chief's failure to honor the alleged promise of the chief's predecessor[.]" *Board's Amended Decision* at 9. On appeal to the ICA, Davenport argued that the Board's findings of fact regarding the cause of his January 1994 injuries were clearly erroneous.[3] The ICA reversed the Board's deter-

mination, but did not address the cause of Davenport's injuries. Thus, it is necessary to clarify the source of Davenport's injury in order to determine the compensability of his claims.

We hold that the Board's findings of fact are not clearly erroneous because the record does not support a firm and definite conviction that a mistake has been made. The Board explained that based on

the opinions of Dr. Trockman, Dr. Rogers, and Dr. Ponce, the written statements of [Davenport's] co-workers, [Davenport's] answers to [the Department's] interrogatories, the fact that [Davenport's] promotion was reinstated in February of 1994, a month after the January 14, 1994 injury date, [Davenport's] continued pursuit of his Civil Service appeal beyond that date, despite the promotion, and the fact that he continued to experience emotional problems that required him to seek psychiatric treatment in October 1994, even though his promotion had already been restored many months before, we find that [Davenport's] January 14, 1994 psychological condition resulted from his involvement in the Civil Service administrative appeals process and not from the new fire chief's failure to honor the alleged promise of the chief's predecessor.

*Id.* at 8–9. Davenport himself attributed his stress injury to "a long series of administrative difficulties regarding [his] promotion over the last several years[.]" *Davenport I,* 100 Hawai'i at 301, 59 P.3d at 936. Moreover, Davenport continued to pursue his appeal to the Commission despite the promotion and felt that the reinstatement of his promotion did not "erase the injustice" that was allegedly done to him while he was seeking to qualify for the promotion. *Board's Amended Decision* at 4. Dr. Rogers's report stated that "[a] contributing factor to the build up of perceived stress over the years has been [Davenport's] dogged persistence in pursuing these [promotion and grievance] issues without compromise." *Davenport I,* 100 Hawai'i at 301, 59 P.3d at 936. Thus, the

---

**3.** Davenport argued that the Board was clearly erroneous in finding that his January 1994 injury was not caused by the Fire Chief's rescission of

his promotion and from the alleged harassment by the Fire Chief.

Board's finding that Davenport's injury stemmed from the Civil Service administrative appeals process and not from the Fire Chief's failure to honor the alleged promise to reinstate the promotion was based on substantial evidence and was not clearly erroneous.

Davenport also appeals the Board's finding that the alleged harassment and threats from the Fire Chief did not contribute to the injury. In its Amended Decision, the Board held that it was "unable to find that such harassment and threats, even if they occurred, contributed to [Davenport's] January 14, 1994 stress injury, because by [Davenport's] own account, the harassment and threats occurred after the January 14, 1994 injury." *Board's Amended Decision* at 9. Thus, the Board did not clearly err in finding that the alleged harassment did not contribute to Davenport's injuries, and we analyze Davenport's claim as if it arose solely out of his frustrations with the Civil Service administrative appeals process.

### 2. *Application of Mitchell*

The determination of what injuries are compensable under Hawai'i's worker's compensation statute is governed by HRS § 386–3(a), which provides:

> If an employee suffers personal injury either by accident *arising out of and in the course of the employment* or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as provided in this chapter.

HRS § 386–3(a) (emphasis added).

In interpreting this statute, the ICA relied primarily on *Mitchell*, 85 Hawai'i 250, 942 P.2d 514. *Mitchell* involved a teacher who sought compensation for psychological injuries sustained from disciplinary action taken against her for violating a school rule. *Id.* The issue before the court in *Mitchell* was "[w]hether an employee's stress-related injury resulting from disciplinary action taken by an employer in response to an employee's misconduct is a compensable injury under HRS § 386–3." *Id.* at 254, 942 P.2d at 518. We held that Mitchell's injuries were com-

pensable because her misconduct involved a violation of school · rules relating to the "method of accomplishing [her] ... ultimate work" and was thus within the course of her employment. *Id.* at 255–56, 942 P.2d at 519–20. We went on to note that other statutes provided express provisions to exclude from coverage stress-related injuries resulting from good faith disciplinary actions. Thus, we held that "[i]n the absence of an express exception in HRS § 386–3 we cannot unilaterally pronounce one. To do so would run counter to the clear import of HRS § 386–3." *Id.* at 257, 942 P.2d at 521.

As discussed above, the ICA relied on *Mitchell* in holding that, in light of the policy to construe chapter 386 broadly and the lack of an express exception for non-coverage of injuries deriving from personnel actions, psychological injuries arising out of non-disciplinary personnel actions are compensable under HRS § 386–3. *Davenport I*, 100 Hawai'i at 307, 59 P.3d at 942. This application of *Mitchell* to the present case, however, is misplaced.

In reading *Mitchell* broadly, we hold that the ICA's interpretation of *Mitchell* is overbroad. In *Mitchell* we held that the court must look at the reason for the disciplinary action and whether it relates to the method of accomplishing the ultimate work. We did not hold that all disciplinary actions are covered by HRS § 386–3, but rather, that the statute did not expressly exclude injuries arising out of disciplinary actions from coverage. *Mitchell*, 85 Hawai'i at 255–57, 942 P.2d at 519–21. Thus, *Mitchell* stood for the proposition that an individual who has sustained a psychological injury resulting from legitimate disciplinary action was not precluded from recovering under the worker's compensation statute.

We then asked whether the action that gave rise to the discipline arose out of and in the course of employment. We specifically pointed to the distinction in *Mitchell* that made the injury in that case compensable. We compared *Mitchell* to our decision in *Wharton v. Hawaiian Electric Company, Inc.*, 80 Hawai'i 120, 906 P.2d 127 (1995), where an employee suffered psychological in-

juries after being disciplined for the unauthorized alteration of his time card. We found that Wharton's injury was not compensable because his action of altering his time card "fell outside the boundaries defining his ultimate work." *Id.* at 123–24, 906 P.2d at 130–31. In *Mitchell*, however, her injury was compensable because the discipline arose from her performance of her duty as a teacher to maintain classroom control. *Mitchell*, 85 Hawai'i at 256, 942 P.2d at 520. We held that "[t]he dispositive question is whether the conduct that gave rise to the disciplinary action is conduct within or outside the course of employment." *Id.*

■■■ The ICA then turned to legislative history to support its conclusion that psychological injuries resulting from personnel actions arise out of employment. It is apparent that the legislature considered extending the amendment to exclude personnel actions, but decided against it and intentionally failed to address the issue in its amendment. The ICA's reading of *Mitchell* and the amendment to mean that "HRS § 386-3 [thus] covers psychological injuries arising out of non-disciplinary promotions and demotions[,]" however, is over-inclusive. The ICA stated that "[o]nce an etiological connection between non-disciplinary personnel action and psychological injury [is] established, it [is] . . . a compensable claim." *Davenport I*, 100 Hawai'i at 308, 59 P.3d at 943. This is but the first step in the analysis. Chapter 386 covers only those injuries that "arise out of and in the course of employment." HRS § 386-3. Thus, once an etiological connection between the personnel action and the injury is established, the court must determine whether the activity that gave rise to the personnel action is work-related.

### 3. The "Unitary" Test

■■■ In determining what injuries arise out of employment, we have adopted a "unitary" test, which

> considers whether there is a sufficient work connection to bring the accident within the scope of the statute. First articulated in *Royal State National Insurance Co. v. Labor and Industrial Relations Appeal Board*, 53 Haw. 32, 487 P.2d 278 (1971), the work connection approach

simply requires the finding of a causal connection between the injury and any incidents or conditions of employment. *Chung [v. Animal Clinic, Inc.*, 63 Haw. 642,] 648, 636 P.2d [721,] 725 [ (1981) ] (citations omitted). The unitary work connection test was formally adopted as the correct means of interpreting and applying HRS § 386-3 in *Chung. Id.* at 649, 636 P.2d at 726.

*Tate*, 77 Hawai'i at 103, 881 P.2d at 1249. "An injury is said to arise in the course of the employment when it takes place within the period of employment, at a place where the employee reasonably may be, and *while he [or she] is fulfilling his [or her] duties or engaged in something incidental thereto.*" *Id.* at 103–04, 881 P.2d at 1249–50 (quoting 1 A. Larson's Workers' Compensation Law § 14.00 (1993)) (emphasis added). The court went on to explain that in determining whether an activity is "incidental to work," the word incident "contains an element of the usual and reasonable, both as to the needs to be satisfied and as to the means used to satisfy them." *Id.* Thus, any activity that is necessary to complete the ultimate work clearly arises out of the work and is compensable. The tasks that are not required by the employer to fulfill the employee's duties are those that fall into the gray area of compensability requiring the analysis of whether it is "incidental" to the ultimate work.

The ICA declined to apply the "unitary" test, stating:

> On this argument, we leave to one side the query whether aspiring to advancement should, as a matter of policy, be considered an intrinsic incident of employment. We instead observe that the *Tate* analysis militates in support of the Board's determination only where, as here, the promotions grievance procedure is a formalized process conducted in all respects outside of the work milieu by a separate agency. In the many, perhaps majority, other instances in which promotions and their related grievances are settled at work, while at work, the *Tate* analysis cuts keenly in the opposite direction. We see no fair or reasoned basis for denying com-

pensation in the former instance while bestowing it in the latter. To do so would be to decide compensability on the mere—and in this context, immaterial—serendipity of the particular administrative apparatus involved.

*Davenport I,* 100 Hawai'i at 309, 59 P.3d at 944. We disagree with the ICA's conclusion that applying *Tate* will lead to inconsistent results by precluding compensation for injuries arising out of external personnel procedures while allowing recovery for similar injuries originating from internal personnel actions. The same "unitary" test should be applied to both situations, and, in either case, the court must analyze whether the activity that gave rise to the promotion or demotion is related to the method of accomplishing or incidental to the ultimate work. Thus, how the promotion or grievance is handled or who handles it bears no relevance to the issue of compensability.

### 4. *Application of the "Unitary" Test*

In applying the unitary test to the present case, we must look at the activity that gave rise to the injury. The Board held that Davenport's injury stemmed from "his involvement in the Civil Service administrative appeals process." *Davenport I,* 100 Hawai'i at 304, 59 P.3d at 939. More specifically, Davenport's injury resulted from the failure of the Personnel Department to take into account his education credits in determining his ranking on the FFIII list of eligibles and his frustration with pursuing his grievance with the Commission regarding the fairness of the promotion process.

A firefighter's voluntary effort to obtain a promotion is not essential to the ultimate duties of a firefighter and does not fall within the box of injuries that are clearly compensable. Thus, we must determine whether the injury sustained under these circumstances is "incidental" to the duties of a firefighter.

The issue of whether an employee's voluntary effort to seek promotion is incidental to employment has not been decided by this court and remains a developing area of worker's compensation law.

When employees, by undertaking educational or training programs, enhance their proficiency in the work, they do in a sense benefit the employer. On the other hand, self-improvement is primarily the employee's own concern. Obviously the ambitious clerk who is burning the midnight oil studying to become an accountant cannot expect workmen's compensation if the lamp blows up. In some situations, however, it may be found that, either by the contemplation of the contract or by custom, the educational activity is part of the employment.

Larson's Workers' Compensation Law § 27.03[1][a] (1999).

In resolving the confusion over the compensability of purely psychological injuries stemming from non-disciplinary personnel actions, some state legislatures have amended their statutes to exclude such injuries from coverage. *See* Larson's § 56.04[5] (providing a list of statutes denying coverage for emotional injuries resulting from bona fide personnel actions). As the ICA pointed out, however, our legislature contemplated joining this trend, but decided against it in declining to address personnel actions in its amendment to section 386–3. It is well-established in Hawai'i that chapter 386 is social legislation that is to be interpreted broadly. *See Royal State,* 53 Haw. at 37–38, 487 P.2d at 281–82; *Mitchell,* 85 Hawai'i at 257, 942 P.2d at 521. "The legislature has chosen to treat work-related injuries as a cost of production to be borne by industry." *Royal State,* 53 Haw. at 38, 487 P.2d at 282. Accordingly, chapter 386 is construed liberally in favor of coverage providing "compensation for an employee for all work connected injuries, regardless of questions of negligence and proximate cause." *Mitchell,* 85 Hawai'i at 257, 942 P.2d at 521 (quoting *Evanson v. University of Hawai'i,* 52 Haw. 595, 600, 483 P.2d 187, 191 (1971)).

Many courts have held that self-improvement and participation in training programs for the purpose of promotion does not fall within the ambit of compensability. *See Jordan v. Pinellas County School Board,* 680 So.2d 448 (Fla.App.1996) (schoolteacher's injuries sustained while attending a workshop

to maintain certification as a teacher was not in the course of her employment because there was no direction by employer to attend the workshop and thus was so removed from any indicia of control by the employer); *Loggins v. Wetumka General Hospital*, 587 P.2d 455 (Ok.1978) (injury caused by nurse's participation in medical training held not compensable because attendance was nurse's decision, on her own time and expense, and hospital did not urge attendance); *Haugen v. State Accident Insurance Fund*, 37 Or.App. 601, 588 P.2d 77 (1978) (holding that a police officer could not recover for injuries sustained during self-designed exercise program for the purpose of meeting written job specifications to remain in good physical condition because the employer did not prescribe what must be done to satisfy the criteria and injury occurred at home on the employee's own time). Although these decisions applied a wide variety of analyses and theories, and each interpreted a unique statute, the underlying theme of these cases centered on the employer's involvement or endorsement of the activity that gave rise to the injury.

Courts finding in favor of compensability have likewise emphasized that their decisions rested on the employer's encouragement and other factors linking the employment to the injury. *See Meaux v. Cormier*, 554 So.2d 285 (La.Ct.App.1989) (awarding compensation to employee aspiring to be promoted to painter who was injured at a paint demonstration because employer encouraged attendance, benefitted from employee's attendance, and implied pressure on employee to attend); *Utah v. Industrial Commission of Utah*, 685 P.2d 1051 (Utah 1984) (compensating employee who was injured on her way to training program because she attended at the direction, expense, and for the benefit of the employer).

In *Courser v. Darby School District # 1*, 214 Mont. 13, 692 P.2d 417 (1984), a teacher sought compensation for injuries he sustained in a motorcycle accident on his way to his master's degree courses taken in order to receive a promotion from the school district. The Montana Supreme Court held that the controlling factors for determining work-relatedness are:

(1) whether the activity was undertaken at the employer's request; (2) whether employer, either directly or indirectly, compelled employees attendance at the activity; (3) whether the employer controlled or participated in the activity; and (4) whether both employer and employee mutually benefitted from the activity. The presence or absence of each factor, may or may not be determinative and the significance of each factor must be considered in the totality of all attendant circumstances.

*Id.* at 419. Under the totality of the circumstances, the court then held that Courser's injuries were compensable because he was encouraged to pursue the master's degree program, the employer received the benefit of a maintaining qualified teachers, and the school exhibited control by requiring approval of Courser's curriculum as a condition of the promotion. *Id.* at 419–20.

Although not expressly enumerating the factors to be balanced, this court has implemented a similar totality of the circumstances test, taking into account the benefit to the employer and the employer's acquiescence in the activity. In *Pacheco v. Orchids of Hawai'i*, 54 Haw. 166, 502 P.2d 1399 (1972), we held that cashing a paycheck during an authorized coffee break is incidental to employment because "it serves the dual function of providing an employee a brief respite from his job as well as affording him an opportunity to tend to matters of a personal nature." *Id.* at 69, 502 P.2d at 1401. Thus, the employer derives a benefit because "a refreshed employee is a more productive one." *Id.*

We noted in *Tate*, after considering the totality of the circumstances, that personal errands are generally not, by their nature, work-related. *Tate*, 77 Hawai'i at 104, 881 P.2d at 1250 (citing *Heverly v. Workmen's Compensation Appeal Bd.*, 134 Pa.Cmwlth. 110, 578 A.2d 575, 577 (1990)). In *Pacheco*, however, we held that personal errands can be compensable if there is a benefit to the employer and the personal errand is authorized by the employer. *Pacheco*, 54 Haw. 166, 502 P.2d 1399. If a personal errand, such as cashing a paycheck during an authorized coffee break, is work-related, we see no reason why, under the same analysis, an examination taken to advance within the

workplace, encouraged and endorsed by the employer, is not also work-related.

The California Court of Appeals took the same position in *Department of Water and Power of the City of Los Angeles v. Workmen's Compensation Appeals Board*, 252 Cal.App.2d 744, 60 Cal.Rptr. 829 (1967). In *Department of Water*, a water meter reader applied for the position of cable splicer in a separate division of the department, which was unrelated to the work of a meter reader. The employee was injured while participating in a test conducted by the city civil service commission as part of the application process for the position of cable splicer, while on his own time and at his own expense. Yet, the court held that the injury was compensable because "the employee was injured on premises controlled by the employer while he was engaged, not in recreational activity, but in an activity directed and controlled by the employer in the furtherance of the employer's business." *Id.* at 747, 60 Cal.Rptr. 829. In so holding, the court noted that

> [i]f there is any reasonable doubt as to whether such activity was contemplated by the employment or whether the injuries were sustained in the course of employment, such doubt should be resolved in favor of compensation coverage in view of the state's policy of liberal construction of the Workmen's Compensation Act in the employee's favor.

*Id.*

In accordance with our policy of liberally construing HRS chapter 386, we agree with the *Department of Water* court and hold that Davenport's January 1994 injury is compensable. Although Davenport was not physically injured while taking the test, he sustained psychological injuries caused by his dissatisfaction with the process for ranking individuals and the overall grievance and promotion processes. Like the employee in *Department of Water*, Davenport took an examination, administered by the state, on state property, and for the benefit of the employer. Undoubtedly, the Department encourages its employees to advance within the ranks of the Department by taking the promotional examination to be placed on the list of eligibles for FFII and FFIII positions. Moreover, the Department derives a substantial benefit from the advancement of its own employees

rather than having to select and train individuals from outside the Department. Thus, if Davenport was directly injured while taking the test, his injuries would be clearly compensable. Here, however, Davenport's stress injury does not stem from taking the test itself, but from the alleged mis-scoring of his results. Although this situation appears two steps removed from the ultimate work, upon closer inspection, it is no less work-related than the activity in *Pacheco* and is incidental to the employment of a Honolulu firefighter.

In *Pacheco* we held that an injury sustained while cashing a paycheck during an authorized coffee break was compensable because the employer benefitted by having a refreshed and more productive employee. Although the cashing of the paycheck was not authorized, the general activity of taking a coffee break was not only permissible, but encouraged. In the present case, the Department derives a substantial benefit from having its own employees seek advancement within the Department. The promotion examination allows the Department an avenue for assessing its current firefighters to fulfill their employment needs rather than hiring outside the Department where the candidate has no history with the Department. Thus, the promotion process is an essential function of the Department, which depends on the application of current firefighters employed within the Department. Accordingly, an injury that stems from that process is incidental to the employment and results from an activity that serves an important interest of the Department. We therefore affirm the ICA's holding that Davenport's January 1994 injury is compensable.

### B. *April 10, 1995 Injury*

▮ With respect to Davenport's April 1995 hypertension injury, the ICA held that the Board was clearly erroneous in finding that Davenport's April 1995 injury was "psychological stress as a result of having to undergo a medical examination on April 10, 1995, while he was on disability for the ... [Achilles tendon] injury." *Davenport I*, 100 Hawai'i at 309–310, 59 P.3d at 944–945. The

Board then held that the injury was not work-related because it was caused by an examination conducted while Davenport was on leave.

In light of all the evidence on the record, we agree with the ICA that the Board's determination that the April 1995 injury was caused by the stress of undergoing a medical examination was clearly erroneous. On his WC–5 Form for the hypertension claim, Davenport described the injury as "stress—cumulative trauma and pain from industrial injuries[,]" and that the injury was "hypertension related to [a] stress claim that has been denied pending investigation." *Id.* at 301, 59 P.3d at 936. Davenport consistently argued on appeal that the injury originated from the Achilles tendon and related stress injuries, not that the hypertension was caused by the stress of the medical examination. Thus, it is clear that Davenport's hypertension injury, although diagnosed during an examination conducted on April 10, 1995, was not caused by that examination.

■ Second, the ICA held that the Board erred as a matter of law by failing to make any findings as to whether the April 1995 hypertension injury was the direct and natural result of the prior Achilles tendon and related stress injuries. "Generally, 'a subsequent injury, whether an aggravation of an original injury or a new and distinct injury, is compensable if it is the direct and natural result of a compensable primary injury.' " *Davenport I,* 100 Hawai'i at 310, 59 P.3d at 945.

> The test for whether a subsequent injury is a direct and natural consequence of a compensable injury is: (1) whether any causal connection exists between the original and subsequent injury; and, if so, (2) whether the cause of the subsequent injury is attributable to some activity that would be customary in light of the claimant's condition.

*Id.* at 310–311, 59 P.3d at 945–946 (footnotes and citations omitted). In *Korsak,* 94 Hawai'i 297, 12 P.3d 1238, we held that, in light of the remedial nature of the worker's compensation statute, "HRS § 386–85 creates a presumption in favor of the claimant that the subsequent injury is causally related to the

primary injury." *Id.* at 301, 12 P.3d at 1248. Thus, the burden is on the employer to rebut the presumption that the secondary injury is causally related to the primary injury. *Id.* Here, Davenport argued to the Board and on appeal that the April 1995 hypertension injury developed from his prior Achilles tendon and related stress injuries that occurred in May 1994, which were held to be compensable. Thus, the burden was on the Department to prove otherwise. The Board failed to make any findings on this issue, however, because it erroneously maintained that the April 1995 injury was not work-related since it was caused by a medical examination conducted while Davenport was on sick leave.

We agree with the ICA regarding its analysis of Davenport's hypertension injury and hold that the Board erred by failing to make any findings of fact regarding the relationship of the hypertension to the Achilles tendon injury. The ICA cited HRS § 91–12 (1993), which provides that the Board must make findings and rulings that are reasonably clear, and the court should not be left to speculate as to the findings of an administrative agency. *Id.* Thus, the ICA had no basis upon which to review the pertinent issues. *Davenport I,* 100 Hawai'i at 311–312, 59 P.3d at 946–947. We therefore affirm the ICA's decision to remand the issue of compensability of Davenport's April 1995 hypertension claim to the Board for a redetermination of whether the injury was a direct and natural result of the Achilles tendon and related stress injuries.

## V. CONCLUSION

For the foregoing reasons, we affirm the ICA's determination of Davenport's January 1994 injury and hold that the injury is compensable under the unitary test. We also affirm the ICA's decision to vacate the Board's determination of Davenport's April 1995 hypertension claim and remand for a redetermination of the issue of compensability.

Concurring Opinion of ACOBA, J.

I concur in granting the application for a writ of certiorari filed by Petitioner/Employ-

er–Appellee City and County of Honolulu, Honolulu Fire Department (the Department). I write additionally with respect to that part of the opinion of the Intermediate Court of Appeals (ICA) which relied upon and applied the 1998 amended version of Hawai'i Revised Statutes (HRS) § 386–3 (Supp.2000) to this case.[1] *See Davenport v. City & County of Honolulu, Honolulu Fire Dept.,* 100 Hawai'i at 299 n. 1, 305–310, 59 P.3d at 934 n. 1, 940–945 (Haw.Ct.App.2001) [hereinafter, the ICA's opinion]. Because the alleged work injuries suffered by Respondent/Claimant–Appellant David K. Davenport occurred prior to the 1998 amendment, that amendment did not apply; rather, the version of HRS § 386–3 then in effect governed. However, whereas the 1998 amendment would not affect stress-related claims resulting from non-disciplinary actions such as those filed by Davenport, the result reached by the ICA was correct.

## I.

The 1985 version of HRS § 386–3 provided as follows:

**Injuries covered.** If an employee suffers personal injury either by accident arising out of and in the course of the employment or by disease proximately caused by or resulting from the nature of the employment, the employee's employer or the special compensation fund shall pay compensation to the employee or the employee's dependents as hereinafter provided.

Accident arising out of and in the course of the employment includes the wilful act of a third person directed against an em-

ployee because of the employee's employment.

No compensation shall be allowed for an injury incurred by an employee by the employee's wilful intention to injury oneself or another or by the employee's intoxication.

HRS § 386–3 (1993). In *Mitchell v. Department of Educ.,* 85 Hawai'i 250, 942 P.2d 514 (1997), disciplinary measures taken by Claimant Regina Mitchell's employer caused her to suffer a stress-related injury.[2] *See id.* at 251, 942 P.2d at 515. Mitchell claimed that the injury was therefore compensable under HRS chapter 386, while her employer maintained that such an injury did not fall within the scope of Mitchell's employment. *See id.* On appeal, the sole issue before this court was "whether an employee's stress-related injury resulting from disciplinary action taken by an employer in response to an employee's misconduct is a compensable injury under HRS § 386–3 (1985)." *Id.* at 254, 942 P.2d at 518. In determining whether Mitchell's misconduct involved a "prohibited overstepping of the boundaries defining the ultimate work to be done by the claimant[,]" *id.* at 255, 942 P.2d at 519 (citation omitted), this court distinguished between "(1) an unauthorized departure from the course of employment and (2) the performance of a duty in an unauthorized manner[,]" *id.* (internal quotation marks and citation omitted). It was determined that Mitchell was disciplined for actions she engaged in while performing a duty of her employment, albeit in an unauthorized manner. *See id.*

As for the question of whether injuries arising from disciplinary actions were com-

---

1. The dissent contends that the application for writ of "certiorari [was] improvidently granted." Dissenting opinion at 498, 60 P.3d at 899. I concur in granting certiorari primarily to clarify the applicability of the 1998 amended version of HRS § 386–3 to the case at bar. *See State v. Hanson,* 97 Hawai'i 71, 73, 34 P.3d 1, 3 (2001) (affirming the ICA but granting certiorari "to clarify the basis for upholding airport security searches"); *Korsak v. Hawai'i Permanente Med. Group,* 94 Hawai'i 297, 300, 12 P.3d 1238, 1241 (2000) (granting certiorari "to clarify several aspects of the ICA opinion"). In contending that clarification is only as to the ICA's citation to the subsequent version of HRS § 386–3, the dissent is mistaken. As indicated *infra,* this opinion

clarifies that: (1) in a 1998 amendment the legislature narrowed the scope of coverage for mental stress claims; (2) the 1998 amendment was not applicable to this case; and (3) however, the result would be same under the pre 1998 version of HRS § 386–3.

2. I observe that the *Mitchell* court construed the 1985 version of HRS § 386–3. *See Mitchell,* 85 Hawai'i at 254, 942 P.2d at 519 (stating that "this appeal presents a single question: whether an employee's stress-related injury resulting from disciplinary action taken by an employer in response to an employee's misconduct is a compensable injury under HRS § 386–3 (1985)").

pensable, the *Mitchell* court, guided by the "plain language of the statute and the legislature's intent that work-related injuries be considered as a cost of doing business[,]" held it was "compelled to hold [the injury] compensable under HRS § 386–3." *Id.* at 257, 942 P.2d at 521 (citation omitted). Specifically addressing the issue of whether mental stress-related injuries that arose out of and in the course of the employment should be excepted from coverage under the statute, *Mitchell* noted that "many jurisdictions with statutes similar to HRS chapter 386 [ (1985) ] have expressly amended them to exclude from coverage psychological or stress-related injuries resulting from good faith disciplinary actions." *Id.* It was concluded that absent such an exclusion, a stress related injury was a covered injury under the worker compensation statute:

> In the absence of an express exception in HRS § 386–3, we cannot unilaterally pronounce one. To do so would run counter to the clear import of HRS § 386–3. If the legislature should deem it advisable in the future, it can ... amend HRS chapter 386 to exclude from coverage those injuries resulting from disciplinary action taken in good faith by the employer. However, unless and until the Hawai'i legislature chooses to amend HRS chapter 386, we are compelled to reach the result we have today.

*Id.* Intervening amendments made to the 1985 version of HRS § 386–3 are not material to the instant case (referred to herein as the pre–1998 version).[3]

## II.

In its opinion, the ICA discussed the effect of the 1998 amendment on Davenport's claims. As the ICA indicated, in 1998, the legislature responded to the *Mitchell* invita-

tion by adding HRS § 386–3(c), which excluded stress related injury arising from disciplinary action from worker compensation coverage, to HRS § 386–3. *See* ICA opinion at 100 Hawai'i at 307, 59 P.3d at 942. The new sub-section carved out the category of claims involved in *Mitchell,* stating that "[a] claim for mental stress resulting solely *from disciplinary action* taken in good faith by the employer *shall not be allowed* [.]" HRS § 386–3(c) (Supp.2001) (emphases added). As the ICA pointed out, in excluding only disciplinary action injury from coverage, the legislature impliedly left other non-disciplinary personnel actions covered under HRS § 386–3. *See* ICA opinion at 100 Hawai'i at 307, 59 P.3d at 942. Where a matter is not explicitly excluded by a statute, it is impliedly included. *See Evanson v. University of Hawai'i,* 52 Haw. 595, 600, 483 P.2d 187, 191 (1971) (holding that, "except those specifically excluded[,]" student employees were included under workers compensation law) (citation omitted).

As observed by the ICA, the legislative history confirms this facial construction. *See* ICA Opinion at 100 Hawai'i at 307, 59 P.3d at 942. In the course of the amendment's passage, "the legislature had considered, but rejected, expanding the scope of the amendment to exclude claims for stress arising out of other, non-disciplinary personnel actions." *Id.* at 100 Hawai'i at 307–308, 59 P.3d at 942–943. As stated by the ICA, in the course of the proceedings, Representative Case remarked:

> The concerns relate to the restriction of this bill for now to "disciplinary actions." *The House version had proposed to extend the applicability of this measure to "other*

---

**3.** Davenport's claims arose out of incidents which occurred prior to the 1995 amendment of HRS § 386–3, which took effect on June 29, 1995. *See* 1995 Haw. Sess. L. Act 234, § 26, at 621. Davenport filed his second claim, however, on April 8, 1996, after the 1995 amendment took effect. Because both incidents occurred prior to the 1995 amendment, the 1985 version, which remained unchanged until 1995, was applicable. Thus, the 1985 version of HRS § 386–3 was relevant in this case. For citation purposes, inasmuch as the correct version of HRS § 386–3 applicable to these events was available in the

1993 Replacement of the Hawai'i Revised Statutes, this volume is cited to.

I note that the 1995 amendment would not affect Davenport's claims, inasmuch as it excluded those injuries incurred "by an employee by the employee's wilful intention to injure oneself or another *by actively engaging in any unprovoked non-work related physical altercation other than in self defense,* or by the employee's intoxication." *Id.* (new material underscored). Accordingly, the 1995 amendment is irrelevant for purposes of the instant case.

*personnel action" as well,* and the House, in conference, in order to define that term as "counseling, work evaluation or criticism, job transfer, layoff, demotion, suspension, termination, retirement or other action associated ordinarily with personnel administration." .... Yet ... *the Senate conference co-chairs ... refused to accede to the House's position to extend this measure to other personnel actions as well.*

*Id.* (quoting Statement of Sen. Case in 1998 House Journal, at 884–85) (emphases added). I believe that, as a result of the 1998 amendment, the legislature narrowed the scope of coverage for mental stress claims, by prohibiting claims resulting "solely from disciplinary action taken in good faith by the employer[.]" HRS § 386–3(c). In other words, after the 1998 amendment, HRS § 386–3 still allowed for compensation of stress-related injury resulting from non-disciplinary personnel decisions.

### III.

However, the ICA appears not only to have utilized the 1998 amendment as an interpretive aid, but to have incorrectly applied the amendment to the present case. *See* ICA Opinion at 100 Hawai'i at 298–299, 59 P.3d at 933–934 ("The Director's decision determined, *inter alia*, that Davenport's claims ... were therefore not compensable pursuant to Hawai'i Revised Statutes (HRS) § 386–3 (Supp.2000)."), *and id.* at 100 Hawai'i at 299 n. 1, 59 P.3d at 934 n. 1 (quoting from the amended version of HRS § 386–3). Absent clearly express contrary legislative intent, the well-established rule of statutory construction forbids the retrospective operation of statutes. *See* HRS § 1–3 (1993) ("No law has any retrospective operation, unless otherwise expressed or obviously intended."). In the present case, Act 224, which amended HRS § 386–3 in 1998, does not contain language that would indicate the legislature's direction or intention that the statute apply retroactively. Accordingly, the presumption

of prospectivity is not rebutted. *See* HRS § 1–3.

### IV.

But, had the ICA applied the pre–1998 HRS § 386–3 provision, it would have reached the same result as it did in applying the 1998 amendment. Under the pre–1998 amendment version of HRS § 386–3, as construed by this court in *Mitchell,* coverage for Davenport's stress-related injury (1) arose out of and in the course of employment,[4] (2) was not barred by HRS § 386–3 (1985), and was thus compensable. Because the 1998 amendment to HRS § 386–3 excluded only stress-related injury stemming from disciplinary action, it did not preclude coverage for such injury resulting from other types of personnel actions, such as the promotion and demotion that Davenport experienced here, not disciplinary in nature.

Subject to the foregoing clarification, I join in affirming the ICA's opinion.

### Dissenting Opinion of MOON, C.J.

I respectfully dissent. Although the majority agrees with the Intermediate Court of Appeals (ICA) that Davenport's injuries are compensable, it grants certiorari because it believes that the ICA erred in (1) relying on *Mitchell v. State Department of Education,* 85 Hawai'i 250, 942 P.2d 514 (1997), to hold that psychological injuries arising out of non-disciplinary personnel actions are compensable under Hawai'i Revised Statutes (HRS) § 386–3 and (2) failing to apply the unitary test outlined in *Tate v. GTE Hawaiian Telephone Co.,* 77 Hawai'i 100, 881 P.2d 1246 (1994), to determine whether the alleged injuries arose out of the claimant's employment. However, given that the ICA's opinion clearly and correctly notes that: (1) there is no express exception for non-disciplinary personnel actions; (2) there is a presumption of compensability; and (3) workers' compensation laws are construed liberally in favor of coverage, I do not believe the alleged errors

---

4. Here, unlike in *Mitchell,* there was no question of whether the acts of the employee that resulted in the employment action constituted "an unauthorized departure from the course of employment[.]" The employment actions in the present case do not appear to be grounded in any conduct by Davenport, and, thus, the "unauthorized departure" exception discussed in *Mitchell* appears inapplicable.

addressed by the majority amount to grave errors of law or inconsistencies dictating the need for further appeal. *See* HRS § 602–59(b) (1993).

With respect to Justice Acoba's concurring opinion indicating his belief that the ICA retroactively applied HRS § 386–3 (2000), I do not believe, based on the ICA's analysis as a whole, that its citation to the subsequent version of HRS § 386–3 constitutes grave error or inconsistencies dictating the need for further appeal. *See* HRS § 602–59(b) (1993). Justice Acoba concedes that the subsequent amendment to HRS § 386–3 (2000) "would not affect stress-related claims resulting from the non-disciplinary actions such as those filed by Davenport," but writes separately to clarify that the ICA erroneously applied the 1998 amendment. Unlike *State v. Hanson*, 97 Hawaiʻi 71, 34 P.3d 1 (2001), and *Korsak v. Hawaiʻi Permanente Medical Group, Inc.*, 94 Hawaiʻi 297, 12 P.3d 1238 (2000), I do not believe, based on the ICA's analysis in this case as a whole, that its citation to the subsequent version of HRS § 386–3 requires clarification of the state of the law. Accordingly, I would dismiss certiorari as improvidently granted.